[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action, filed in August, 1993,[1] challenges the validity of a May, 1992 agreement between the University of Bridgeport ("UB") and its Board of Trustees[2] and an organization known as the Professors World Peace Academy ("PWPA").[3] The agreement describes PWPA as follows: "PWPA is a charitable and educational corporation exempt from income taxation under the provisions of Section 501(c)(3) of the [U.S. Internal Revenue] Code. Among its purposes are the promotion and fostering of international cooperation and peaceful human values and the education of citizens of various nations for peaceful world citizenship. It is the recipient of financial support from individuals and organizations sympathetic to the Unification Church movement rounded by the Reverend Sun Myung Moon." PWPA is a nonprofit corporation formed under the laws of the District of Columbia. The agreement between UB and PWPA stated, among other things, that "over the past two years [1990 and 1991], [UB] has suffered . . . declining enrollment, accreditative problems and financial difficulties."[4]
The plaintiffs consist of a UB student,[5] five UB alumni, seven donors to UB, a former trustee and a "life" trustee. In an amended complaint, dated May 25, 1994, the plaintiffs allege that CT Page 8265 UB entered into an agreement with the PWPA whereby the PWPA lent substantial sums of money to UB in consideration for a secured loan on the UB property and a right to select 60% of the UB trustees.[6] The plaintiffs further allege that the PWPA was rounded to further the goals of the Unification Church, because the agreement permits the PWPA to have control over the UB Board of Trustees. The plaintiffs contend that such action violates a charter granted to UB by the State of Connecticut on May 5, 1927, which requires that UB be operated as a non-sectarian institution and be free from religious affiliation.
The plaintiffs seek a declaratory judgment determining the validity of the agreement. If this court finds that the agreement is void and/or illegal, the plaintiffs request an injunction restraining defendants from operating UB and conferring degrees. Alternatively, the plaintiffs request that the court appoint a receiver to remove the present Board of Trustees at UB and select a new board not affiliated with the PWPA.
In October, 1993, both UB and its Board of Trustees and the PWPA filed motions to dismiss the plaintiffs' action on the ground that the plaintiffs lack standing to bring the action and thus this court is without subject matter jurisdiction.[7] Once a motion to dismiss challenging subject matter jurisdiction of the court is filed, all activity must cease, and the motion must be addressed. Gurliacci v. Mayer, 218 Conn. 531, 545,590 A.2d 914 (1991) ("It is axiomatic that once the issue of subject matter jurisdiction is raised, it must be immediately acted upon by the court"). Discovery on the part of the plaintiffs was, however, permitted, and thereafter this court held a so-calledStandard Tallow[8] evidentiary hearing in May, 1994, to determine certain factual issues involved in the student plaintiff's claim of aggrievement.
In ruling on a motion to dismiss, the court must construe the complaint in the light most favorable to the plaintiff. Duguayv. Hopkins, 191 Conn. 222, 227, 464 A.2d 45 (1983). "`[T]he motion to dismiss is the proper vehicle for claiming any lack of jurisdiction in the trial court'" (Citation omitted.) Upson v.State, 190 Conn. 622, 625 n. 4, 461 A.2d 991 (1983). A motion to dismiss may be asserted for lack of jurisdiction over the subject matter. Zizka v. Water Pollution Control Authority, 195 Conn. 682,687, 490 A.2d 509 (1985).
"When a party lacks standing to sue, the court is without CT Page 8266 subject matter jurisdiction to determine the cause." Tomlinsonv. Board of Education, 226 Conn. 704, 717,629 A.2d 333 (1993); Monroe v. Horwitch, 215 Conn. 469, 473,576 A.2d 1280 (1990). "`When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue and not whether the controversy is otherwise justiciable, or whether on the merits, the plaintiff has a legally protected interest that the defendant's action has invaded.'" (Citations omitted.)Connecticut Assn. of Boards of Education, Inc. v. Shedd,197 Conn. 554, 558, 449 A.2d 797 (1985). "One cannot rightfully invoke the jurisdiction of the court unless he has, in an individual or representative capacity, some real interest in the cause of the action, or a legal or equitable right, title or interest in the subject matter of the controversy." InvestorsMortgage Co. v. Rodia, 31 Conn. App. 476, 479, 625 A.2d 823
(1993).
General Statutes § 52-29(a) provides that "[t]he Superior Court in any action or proceeding may declare rights and other legal relations on request for such a declaration, whether or not further relief is or could be claimed." Practice Book § 390 provides in pertinent part that the court will not enter a declaratory judgment: "a) unless [a party] has an interest, legal or equitable, by reason of danger of loss or of uncertainty as to his rights or other jural relations; or (b) unless there is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement between the parties . . . ." "`It is a basic principle of our law . . . that the plaintiffs must have standing in order for a court to have jurisdiction to render a declaratory judgment.'" Connecticut Business Industry Assn., Inc. v. CHHC,218 Conn. 335, 346, 589 A.2d 356 (1991), quoting ConnecticutAssn. of Boards of Education, Inc. v. Shedd, supra, 197 Conn. 558. "The declaratory judgment procedure . . . may be employed only to resolve a justiciable controversy where the interests are adverse, where there is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which require settlement." (Citation omitted; internal quotation marks omitted.) Id., 347-48.
"A party pursuing declaratory relief must . . . demonstrate, as in ordinary actions, a `justiciable right' in the controversy sought to be resolved, that is, `contract, property or personal rights . . . as such would be affected by the [court's] CT Page 8267 decision . . . .'" (Citations omitted.) Connecticut Business Industry Assn., Inc. v. CHHC, supra, 218 Conn. 348. "As long as there is some direct injury for which the plaintiff seeks redress, the injury that is alleged need not be great." Maloneyv. Pac, 183 Conn. 313, 321, 439 A.2d 349 (1981).
"`The question of standing [to pursue a declaratory judgment] is essentially one of aggrievement.'" New Haven Firebird Societyv. Board of Fire Commissioners, 32 Conn. App. 585, 593,630 A.2d 136 (1993), quoting Munhall v. Inland Wetlands Commission,221 Conn. 46, 54, 602 A.2d 566 (1992). "Whether the plaintiffs have been aggrieved is an issue of fact for the trial court to determine." New Haven Firebird Society v. Board of FireCommissioners, supra, 593. Standing and aggrievement will be analyzed separately as to each of the four categories of plaintiffs.
I. Students
The amended complaint identifies plaintiff Aisha Abdullah, a/k/a Aisha Wright ("Wright") as a current student at UB. In this complaint, three of Wright's interests are alleged to be endangered by the agreement between UB and the PWPA: (1) a liberty and contract interest in ensuring that the school she attends is nonsectarian as advertised and required by the charter; (2) a contractual interest in educational benefits and certification opportunities which is put into question by the agreement; and (3) substantial questions regarding how she should conduct her future education.
The issue of when a student has standing to challenge the actions of a university's board of trustees or directors has not been addressed in Connecticut. In other jurisdictions, students have been found to have standing in limited situations only. For example, in Galton v. College of Pharm. Sc., Columbia Univ.,332 N.Y.S.2d 909, 912 (N.Y.Sup. 1972), a court found that students had standing when the university threatened to close a pharmacy school because, absent financial impossibility, "[u]pon admission of a student to a college there is some obligation upon the part of the college to permit the student to continue his studies to graduation if willing and eligible to continue . . . ." See alsoZumbrun v. University of Southern California, 101 Cal.Rptr. 499,504 (Cal.Ct.App. 1972) (student could maintain breach of contract action when professor terminated course in which she was enrolled one month before final examination). Similarly, in CT Page 8268DeVito v. McMurray, 311 N.Y.S.2d 617, 620 (N.Y.Sup. 1970), a court found that students had standing to seek a permanent injunction when the faculty discontinued their classes contrary to a clear board resolution. The court noted that although it generally "will not interfere with the exercise of administrative discretion vested with administrators in charge of the educational institution," where there is no scope for the use of this discretion, a court could find that an administrator exceeded his authority. Id. Thus, students have been found to have standing when their education is directly affected by actions of school officials. In the present case, however, Wright did not claim that she was denied courses or that any degree programs in which she was interested at UB were canceled.
In another case, a court held that a student body, faculty and staff had standing to institute a class action against a college, its president and board of directors for misuse of federal and church funds. See Jones v. Grant, 344 So.2d 1210,1212 (Ala. 1977). Viewing the college as a charitable trust, the court noted that "`[t]he prevailing view of other jurisdictions is that the attorney general does not have exclusive power to enforce a charitable trust and that a . . . person having a sufficient special interest may also bring an action for this purpose.'" (Citation omitted.) Id. The court found the students were beneficiaries of a charitable trust insofar as the federal and church funds were given for the benefit of the students, and they therefore had the special interest required to maintain an action to enforce the trust or prevent diversion of funds. Id.
Students have also been permitted to bring an action when a fundamental right is impacted or when the university is violating a state law. See Smith v. Regents of Univ. of California,844 P.2d 500, 506 (Cal.) cert. denied, 114 S.Ct. 181, 126 L.Ed.2d 140
(1993) (students had standing to challenge mandatory student activities fee used to fund political and ideological causes because compelling such contributions impacted students' first amendment rights); Durham v. Parks, 564 F. Sup. 244, 249 (D. Minn. 1983) (court found that student's allegation of loss of educational benefits to be sufficient for standing to bring discrimination action under Title IX); Students for EthicalTreatment of Animals v. Iacuc, 833 P.2d 337, 338 (Or.Ct.App. 1992) (students had standing to challenge university committee's violation of state public meetings law, since statute did not require plaintiffs to be personally affected by a decision in a closed meeting to bring action). In the present case, Wright is CT Page 8269 not claiming that her fundamental right of freedom of religion has been impacted as a result of the agreement.
The present case is quite similar to Miller v. Alderhold,184 S.E.2d 172, 175 (Ga. 1971), where students filed a class action challenging the board of trustees' sale of university lands. Like the plaintiffs in the present case, the plaintiffs inAlderhold alleged that "the trustees have failed and refused to promote the purposes and objectives of the college as defined in its charter. . . ." Id., 173. The court found that the students had "no vested financial interest in the institution" and therefore did not have standing "to challenge the acts of the trustees or others in the operation and management of the college." Id., 175. Although the majority described the college as a private corporation and the concurrence characterized it as a charitable trust which could be enforced by the attorney general, they were in agreement that the students did not have standing to bring the action. Both the present case andAlderhold involve student plaintiffs attempting to challenge a decision of the board of trustees that does not directly affect them. In Alderhold, students as a class were attempting to challenge the administration's decision to sell certain lands, while in the present case one student is attempting to challenge the validity of a loan agreement entered into by the UB Board of Trustees.
As a general rule, absent special injury to a student or violation of his or her fundamental rights, students do not have standing to challenge the management or operation of the university. "[S]tudents are fluctuating, and no individual among our youth has a vested interest in the institution, which can be asserted in a court of justice." The Trustees of DartmouthCollege v. Woodward, 17 U.S. 518, 641, 4 L.Ed. 269 (1819).
At the evidentiary hearing regarding this motion to dismiss, Wright was asked what impact the UB/PWPA agreement had upon her. Wright claimed that the agreement affected the academic reputation of UB. However, there was no evidence presented to that effect, nor was there evidence that she was harmed by the alleged loss of academic reputation. Rather, Wright testified that she received her associate paralegal degree from UB in approximately May, 1993, and is currently employed by a Bridgeport law firm, where she had previously worked for academic credit. Wright also claimed that the "warm and friendly" atmosphere at UB changed after the agreement and that she had CT Page 8270 heard of other students who were harassed at UB. However, no student, including Wright, testified that he or she was harassed in any way or subjected to religious influences at UB. When Wright was asked if she personally had been hampered in any attempts to practice her religion at the UB religious center, she answered in the negative. She indicated that she had used the religious center and that she had never been pressured because of the fact that she was Muslim. She was unable to point to any sectarian characteristic of UB as a result of the agreement. When asked if any of the degree programs in which she was interested were canceled or if she was ever denied any courses, Wright also answered in the negative.
Furthermore, Wright testified that she was not presently taking courses at UB, as she voluntarily left the university in the fall of 1993, intending to return when she was "satisfied that the school is making good on its commitment to remain independent from the Unification Church and nonsectarian."[9]
Wright testified that she is currently taking a full courseload at the Housatonic Community College. Wright apparently believes that silent attendance is equivalent to support of the PWPA, and that this is the reason that she withdrew from UB for a year and the reason for bringing this lawsuit. She testified that although she does not want to see UB close its doors, closing the university would be acceptable if it were the only way to rid UB of the PWPA's influence.
The first interest that Wright asserts in the complaint is a liberty and contract interest in attending a nonsectarian university. However, the agreement at issue states that "UB will continue to be a tax-exempt, nonsectarian, nondenominational educational institution . . . ." Wright did not testify to any sectarian characteristics of UB as a result of the agreement. Wright also testified that she has not been thwarted in her attempts to use the religion center at UB to practice her own religion. Thus, Wright did not claim that her first amendment rights have been violated. Wright's second interest allegedly injured by the agreement is a contractual interest in educational benefits and certification opportunities. Wright's testimony indicated that her education continued as usual, no classes or programs were canceled, and she received her associate degree. Thus, Wright did not claim that UB breached any contract it may have had to permit her to continue her education. Absent any injury or threatened injury. Wright's allegation that these benefits are "put into question" by the agreement is not sufficient to confer standing. Mere uncertainty CT Page 8271 resulting from the agreement between UB and the PWPA does not amount to the requisite injury to a contract, property, or personal right. Similarly, Wright's third interest, i.e., "substantial questions regarding how she should conduct her future education," does not amount to a tangible interest.
A plaintiff must establish "a colorable claim of direct
injury." Monroe v. Horwitch, supra, 215 Conn. 473. When a party does not rely upon a certain statute that confers standing, "`his standing depends on whether he has a sufficiently personal stake in the outcome of the controversy and he is not entitled to vindicate his own value preferences through the judicial process.'" (Citations omitted.) Orsi v. Senatore, 31 Conn. App. 400,414-415, 626 A.2d 750 (1993). Wright has not demonstrated that she has a legal, equitable or contractual interest that is harmed or endangered by the agreement. Although Wright may truly believe that the agreement with the PWPA is not in UB's best interest, she was unable to demonstrate any sectarian influence or that the agreement affected her in any direct manner. Wright has not demonstrated aggrievement and therefore lacks standing to bring plaintiffs action.
II. Alumni
In the complaint, it is alleged that the plaintiffs Lisa Broder, Elizabeth Gara, Beatrice Steeneck, Britta Wittenberg, and Bruce Pfeffer are UB alumni. The plaintiffs allege that the named alumni have the following interests that are endangered by the agreement: (1) a personal interest in ensuring that UB continues to comply with state law and its charter brought action to challenge grade policy, court said since she suffered no injury, claim was moot); Corporation of Mercer University v.Smith, 371 S.E.2d 858 (Ga. 1988) (finding alumni, former trustees, former professor, district attorney, and donor had no standing to bring action to set aside merger).
"[A] college [only] has a contractual duty to educate its undergraduates . . . and a duty to treat each student fairly and non-discriminatorily." Ad hoc Committee v. Bernard M. BaruchCollege, supra, 726 F. Sup. 522-23. In the present case, the plaintiff alumni have already received their degrees, and the injuries they have allegedly suffered due to UB's alleged loss of academic reputation fall within the "impermissible realm of general speculation about unproven hypothetical situations."Maloney v. Pac, supra, 183 Conn. 322. Having failed to CT Page 8272 demonstrate aggrievement, the alumni plaintiffs are without standing to bring the present action.
III. Donors
In the amended complaint, it is alleged that plaintiffs Joel Schine, Ruth Steinkraus Cohen, Miriam Schine-Elkin, Mildred Siegel, Edith Katzen, Eleanore Weiss and Beatrice Steeneck are UB donors. The plaintiffs allege that: (1) Schine and Schine-Elkin's family so that the value of their degrees is not diminished; (2) a contractual and equitable interest in participating in the UB sponsored alumni association, which is now threatened by the alleged illegality of the agreement; and (3) "an implied personal duty" as alumni to protect UB's interests.
The issue of whether alumni have standing to challenge the actions of their alma mater has not been addressed by our Connecticut courts. However, in an action by alumnae who alleged that Yale University's procedures for treating sexual harassment violated Title IX, the Second Circuit Court of Appeals found that "graduation has mooted their claims for grievance procedures."Alexander v. Yale University, 631 F.2d 178, 185 (2d Cir. 1980). In an action brought by alumni alleging that a college selectively refused to grant recognition to an alumni association dedicated to the concerns of minority students, another federal court noted that "in the absence of any other factors, it is apparent that, upon graduation, one may no longer look to one's alma mater for other than such things as a transcript of grades as needed." Ad Hoc Committee v. Bernard M. Baruch College,726 F. Sup. 522, 523 (S.D.N.Y. 1989); see also Hamer v. Board ofEducation, 488 N.E.2d 1096, 1102 (Ill.App.Ct. 1986) (when former high school student name is on a building and the Siegel, Katzen, and Weiss family names are associated with scholarships, so they have a personal interest in freedom of association and speech that their names and donations are not used by a school that has violated its nonsectarian charter and is being operated in an unlawful manner; and (2) Schine and Schine-Elkin have a legal and equitable interest in that UB represented to them that it would act lawfully and comply with the charter.
Although some cases support the right of a donor of a charitable gift to bring an action to enforce a trust or to prevent misuse or diversion of the property or fund, "[m]ost decisions . . . limit the right to instances were the gift is conditional or ineffective, or there is a clear reservation of CT Page 8273 right to terminate or revoke it." 15 Am.Jur.2d Charities § 148, pp. 175-76. "The Restatement of Trust takes the view that the donor, having parted with his interest, lacks sufficient interest to demand judicial enforcement of [a] trust, and there are also numerous decisions to that effect." Id., 176. Moreover, it appears that universities are regarded as private corporations rather than charitable trusts. See Miller v. Alderhold, supra, 184 S.E.2d 176, and Corporation of Mercer University v. Smith, supra, 371 S.E.2d 860[10].
Whether a university is viewed as a private corporation or a charitable trust has not been recently addressed in Connecticut. In Connecticut College v. Calvert, 87 Conn. 421, 423, 88 A. 633
(1913), the court noted that a college whose establishment and maintenance expenses were provided, at least in part, through voluntary contributions, is a public charity. See also Lockwoodv. Killian, 172 Conn. 446, 512, 375 A.2d 996 (1977) (trust for advancement of education is charitable). "State legislation provides that the attorney general `shall represent the public interest in the protection of any gifts, legacies or devises intended for public or charitable purposes.'" Lieberman v.Rogers, 40 Conn. Sup. 116, 117, 431 A.2d 1295 (1984), quoting General Statutes § 3-125. This power is broad enough to include enforcement, administration, invalidation, or termination of a charitable trust. Id., 118. "The Attorney General is a necessary party in cases involving funds"; id., 120; as such officer "has been traditionally imbued with the power to bring an action against the trustee for malfeasance." Id., 119; Copp v. Barnum, 160 Conn. 557,558, 276 A.2d 893 (1970).
In the present case, the Attorney General is not a plaintiff. Rather, the Attorney General's office was defending the BGHE until the action was withdrawn as to this defendant in May of this year. Furthermore, the donor plaintiffs have not alleged pecuniary injury or that their donations had any type of condition attached. In the few cases where courts found that donors had standing, trust principles rather than corporate principles were applied. Therefore, it is not necessary to decide whether UB is a charitable trust or a private corporation. The donor plaintiffs have not demonstrated that they have an equitable, legal or contractual interest affected by the UB/PWPA agreement. The donor plaintiffs have not demonstrated aggrievement and therefore lack standing to bring this action.
IV. Individual Trustees
CT Page 8274
It is alleged in the amended complaint that plaintiff Steeneck is a former trustee of UB and that plaintiff Cohen acted as and continues to have the status of a "life trustee." The plaintiffs allege that Cohen[11] has the following interests that are endangered by the agreement between UB and the PWPA: (1) a property and personal interest in ensuring that UB operates lawfully and pursuant to its charter; and (2) a property interest in being notified of deliberations from which she was excluded and which lead to the acceptance by UB of the UB/PWPA agreement. The plaintiffs also argue that entering into the agreement was an ultra vires act and Cohen, pursuant to General Statutes § 33-429 of the Nonstock Corporation Act, has statutory standing as a member of a nonstock corporation to challenge the UB Board of Trustees' action.[12]
In The Trustees of Dartmouth College v. Woodward, supra,17 U.S. 641, trustees and donors were granted standing to bring an action against the university to challenge a violation of its charter. However, the Dartmouth College case is distinguishable from the present case. In that case, the state passed an act that amended the university's charter, increasing the twelve person board to twenty one, and creating a board of overseers. Id., 626. The individuals bringing the suit were the original trustees, named by the founder in his will. Id., 641. The court found that the charter was "reorganized in such a manner as to convert a literary institution, moulded according to the will of its founders, and placed under the control of private literary men, into a machine entirely subservient to the will of the government." Id., 653. The plaintiffs in issue in Dartmouth College were found to have standing based on the states's seizure of control over a private corporation, an occurrence not found in the present case. UB's charter was not amended and the state is not involved. Furthermore, the PWPA does not have a board of overseers and rather than having the power to appoint the board, it has the power to nominate members.
Cohen, by her own admission, held an honorary position on the UB Board of Trustees. Even if Cohen were a voting member of the board. Connecticut caselaw indicates that she would not have standing as an individual. In Munhall v. Inland WetlandsCommissions, supra, 221 Conn. 53, individual members of the commission appealed a decision by file entire commission in which they dissented. The court found that "neither their interest as dissenting commission members nor their general interest as CT Page 8275 residents and taxpayers rises to the level of the personal interest required in order to fall within the meaning of `a person aggrieved.'" Id. See also Tyler v. Board of ZoningAppeals, 145 Conn. 655, 659, 145 A.2d 832 (1958) (court declined to give standing to individual zoning commission members).
Although the above cases deal with members of administrative agency commissions rather than a board of trustees at a university, the same rationale applies. In this action, not only is the action brought by an individual nonvoting member of the board, rather than the board as a whole, but the board is named as a defendant. Furthermore, Cohen never possessed voting powers and could not have voted against the UB/PWPA agreement. Cohen has not demonstrated that the fact that she was a "life trustee" bestowed any type of property interest upon her, either a property interest in ensuring that UB comply with its charter or in being notified of all board meetings. It is also unclear what personal interest Cohen has in the affairs of UB, other than her obvious affection for the university. Cohen's testimony at the hearing regarding this motion to dismiss indicated that she truly cares about the future of UB, having generously dedicated a great deal of her time and resources to UB over the years. However, this alone does not amount to the classical aggrievement required to give her standing to bring this action.
The plaintiffs also argue that Cohen has statutory standing to bring this action pursuant to General Statutes § 33-429. They claim that entering into the agreement was an ultra vires act on the part of the UB Board of Directors and that Cohen, as a "member" of the nonstock corporation of UB, has standing to challenge such act. General Statutes § 33-429 provides in pertinent part that "[n]o act of a corporation and no conveyance or transfer of real or personal property to or by a corporation shall be invalid by reason of the fact that the corporation itself was without the capacity or power to do such act or to make or receive such conveyance . . . ." The statute provides that such lack of capacity may be asserted in a proceeding by amember or director against a corporation to enjoin the act or transfer of property by or to the corporation. Section 33-429 also permits such an action to be brought by the corporation itself through a receiver. trustee or other legal representative and by the attorney general[13] in a proceeding "to dissolve the corporation or to enjoin the corporation from the conduct of unauthorized affairs." CT Page 8276
As noted above, plaintiffs argue that Cohen is a member of the nonstock corporation UB. "Member" is defined as "one having membership rights in a corporation in accordance with the provisions of its certificate of incorporation or bylaws." General Statutes § 33-421(j).[14] Even assuming that Cohen was a "member" of UB pursuant to the statute, she could not obtain the remedy sought by plaintiffs since "completed transactions may not be invalidated through the force of an ultra vires claim." S. Cross, Connecticut Corporate Law Practice, § 3.8, p. 103 (Supp. 1991); see also Fletcher Cyclopedia on the Law of PrivateCorporations, § 3497, p. 107 (1989). Connecticut's ultra vires statutes "give shareholders a remedy against a management which overreaches its authority, and the state attorney general a basis for action against the corporation, and . . . at the same time blocks attacks on completed transactions." Cross, supra, § 3.8, pp. 103-104. The UB/PWPA agreement is a completed transaction, having been executed in May, 1992. Plaintiffs in this action are seeking to nullify the agreement. Even if Cohen is a "member," nothing in the Connecticut corporate statutes gives her a right to undo an executed agreement over two years after the fact, particularly since UB has been functioning under this agreement since that time. Cohen, therefore, does not have standing pursuant to § 33-429 or any other part of the nonstock corporation act to be granted the requested relief.
For all the reasons stated above, none of the plaintiffs, the student, the alumni, the donors, or the trustees, have the requisite standing to bring this proceeding. Accordingly, the motion to dismiss this action for lack of subject matter jurisdiction is granted.
So Ordered.
Dated at Stamford, Connecticut, this 18th day of August, 1994.
William B. Lewis, Judge